Brezhnov v. New York State Alright, good morning, Ms. Saltzman. You're reserved two minutes for rebuttal. You can begin whenever you're ready. Thank you, Your Honor. Good morning. May it please the Court. I'm Charlotte Saltzman, representing Plaintiff Appellants in this matter. This Court should reverse the lower court's ruling and remand for further proceedings. The State Defendants in NYCHA in this case each administered separate federally funded programs to make housing unavailable for our plaintiffs in violation of clearly established anti-discrimination law. At the motion to dismiss stage, the District Court unduly narrowed the ongoing harms and injuries as pled in the amended complaint, and in doing so, erected improper procedural barriers that foreclosed relief plaintiffs are meant to access from these statutes. I'll focus on three arguments today. I'll first clarify plaintiff's claims against NYCHA, focusing on the Title VI claims based on the implementation of the Section IX program. I'll then address qualified immunity, focusing on Commissioner Gwinn's intentional racial discrimination as well pled in the amended complaint. And I'll lastly turn to OTDA, focusing on residents to preserve public housing, standing to bring claims for injunctive relief for ongoing harm. First, turning to NYCHA. The lower court here erroneously tied plaintiff's standing to bring Title VI claims against NYCHA to its participation and administration of the Emergency Rental Assistance Program. But NYCHA is a federally funded entity as part of the Section IX program, so they remain liable for discrimination that occurs as part of the Section IX program. Can you identify for me where there is racial discrimination on the part of NYCHA? Certainly, Your Honor. We would first point out that whether racial discrimination occurred or not is a question of merits that the lower court didn't reach. But the racial discrimination... I'm just trying to understand what the claim is. Certainly, Your Honor. As part of a recertification scheme, NYCHA here failed for years to recertify plaintiffs properly, and then proceeded to bring... And then they treated white residents differently? The allegation here, Your Honor, is that it's a disparate treatment case. Disparate as compared to whom? This is where discovery is necessary, but NYCHA... You have a complaint. You're alleging that NYCHA discriminated on the basis of race and, I guess, national origin, but we'll just for shorthand call it race. And I'm trying to figure out who are the comparators that were better treated than the minority residents of NYCHA? Certainly, Your Honor. And again, this is briefed, well, a much better brief below on the merits question, but in its implementation... I just want to know what the answer is. I don't care where it was briefed. I just want to know who is treated better than the plaintiffs on the basis of race by NYCHA? Our claim here is that NYCHA does not need to treat other of its own tenants, other people in its own population, differently in order for... You mean, any time NYCHA does something bad to its residents, it is automatically racially discriminating because so many of the residents are minorities? No, Your Honor. NYCHA failed to recertify the incomes of its plaintiffs... Again, they may have violated some rule that says they're supposed to do this, but I'm just trying to understand the racial discrimination claim against NYCHA. NYCHA understood that its population was 90% Black and Hispanic and allowed... Excuse me. Any time that NYCHA does something bad or unfair or unreasonable to all of its population, it is automatically discriminating on the basis of race? No, Your Honor. And that's where experts and other things would be necessary here, but NYCHA acted in a racial capitalism. What is an expert going to tell us about the fact that NYCHA... Unlike the state... I understand your claim of at least impact, disparate impact discrimination on the part of the state because you're saying the state treats NYCHA residents who are predominantly Black and Latino differently than it treated non-public housing residents who are typically richer and whiter, right? I get that. But NYCHA does nothing with respect to the general population of renters. It only deals with its own clientele. So I'm trying to understand how, other than by treating some of its residents differently than others on the basis of their race, how it can be... I mean, who is it that they are treating better than the minority residents? Your Honor, like a predatory lending claim, for example, if you target a specific group of people, you don't necessarily... They're not targeting a group of people. That's their people. That's their tenants. That's who they deal with. They didn't go out and say, let's get a bunch of vulnerable tenants and treat them badly. They are in charge of public housing residents, right? Yes, Your Honor. And they didn't act like a rational landlord in how they completed their... Well, of course they don't act like a rational landlord. A rational landlord wouldn't rent to these people. They're not in the marketplace. They are performing a particular public function vis-a-vis people who are disadvantaged in the private marketplace. And they are constrained by various rules. I get that in how they deal with those tenants. But I just don't understand where there is a racial issue. Well, we would argue, Your Honor, that they do compete like other landlords in the sense that they should want to recoup money for rent. Here, as plaintiff's landlord, they didn't help them with the emergency rental assistance program. And then they didn't recertify their incomes to a level that they would then be able to pay that money back. And in addition, get the money from this... Wait, wait, wait. They didn't recertify their income level would result in their having a lower rent and NYCHA getting less money. No, then the federal government would have to pay that difference and they would receive that funding had they been properly recertified. These actions indicate that NYCHA was acting as part of a racial capitalism scheme, understanding that the people that were accruing debts and accruing loans during the pandemic were black and brown people. But again, Your Honor, we would just point out that that's not the ruling that was made at the lower court. The lower court dismissed the claims against NYCHA first standing, finding that there were no remaining Title VI violations. When the arrears that are accruing in state court right now are clear damages as a result of the titles of the implementation of the Title VI program. If I can briefly turn to the state defendants, Your Honor, I'd like to turn to the qualified immunity issue. The amended complaint here plausibly alleges intentional discrimination by Commissioner Gwynne that went beyond what was required of the statute, even if presumptively valid. There's no qualified immunity defense when a state actor is acting with the intent to discriminate, and this is well pled in the amended complaint. And what is the allegation of intentional? I understand that there is a disparate impact kind of claim. Yes, Your Honor. But what is the evidence of intentional discrimination on the basis of race? I would point the court to paragraphs 94 through 96 of the amended complaint, which shows that, for example, Commissioner Gwynne continued to raise the AMI of eligible applications up to 120, which is far beyond what was required of the statute, and then proceeded to close the applications to all but seven counties, six of which were far predominantly white, the seventh being Westchester County, excluding Yonkers. This shows a preference by Commissioner Gwynne to exhaust funds so that our plaintiffs could not access them, and shows at least a dispute of fact as to whether intentional occurred. Where there's a dispute of fact as to whether intentional racial discrimination occurred, it cannot be that the law is clearly established and excuses Commissioner Gwynne's conduct. So as to the qualified immunity issue as to Mr. Quinn, what was the established right you claim he should have known? We believe that Commissioner Gwynne should have understood that she cannot be motivated based on race when she's making decisions in how to spend Federal funding and in how to make housing decisions, in how to provide housing opportunities. Commissioner Gwynne was also certainly aware of the disparate impacts that her actions were having, even if she was not aware at the first implementation of the statute. As this program went on, she was certainly aware of the demographics of the people that she was affecting and that were being left out of this program. She sat on NYCHA applications as she watched them accrue, and then continued to open up the program to more people so that our plaintiffs, NYCHA residents, could not access them. The clearly established right here has been established under the Fair Housing Act since the Arlington Heights factors. She knows that she cannot discriminate based on race, even if she's not using the words, I am discriminating based on race. This is a clearly established right, and it should not be decided at the motion to dismiss. What if there is a perfectly plausible explanation that was offered for why this was done? If there's a plausible explanation, that's still not proper for the qualified immunity decision. This should go back for a 12B6 ruling as to the merits of the claim and facts finding. But again, there's no business justification for intentional racial discrimination. Certainly, that would speak to the disparate impact. But this all goes to the notion that the awareness of a disparate impact equals intentional discrimination, is it not? Well, we believe that Commissioner Gwynne was acting with an intent to discriminate. We believe that. What is the evidence of that other than that she must have been aware of the disparate impact? The way that she implemented the program indicates that she was closing off the application to predominantly black and brown counties. She was closing off the obligation to public housing residents who are otherwise protected, at least if NYCHA was doing its job, as you say they weren't, right? Because they would automatically receive rent protection under the terms of their public housing, while private marketplace participants had no such opportunity. And the state made a decision to prioritize people in the private market. Now, are you telling us that it was clearly obvious, should have been obvious to anyone, that acting on that policy constituted intentional racial discrimination? No, Your Honor. We don't believe that just implementing the statute on its own is enough for intentional racial discrimination to occur. This program went on for years, and Commissioner Gwynne took specific actions that went well beyond what was required of the statute. And just, Your Honor, the basically the same policy judgment, distinguishing between people in the private marketplace and people whose ability to pay the rent was baked into the impact of the pandemic, was in effect baked into the terms of their public housing. Because if NYCHA was doing what you say it should have been doing and wasn't, which is a separate claim, then they would automatically have had their rent lowered, right? No, Your Honor. They would still have to pay up to 30 percent of their rent, of their income in rent. Right. Whereas the people in the private marketplace would have to pay up to 100 percent of their rent without the benefit of the emergency program. Well, that's what the area median income is meant to do. This statute, the way Commissioner Gwynne implemented it, was to open up the program to people with an AMI of up to 120. This goes beyond protecting people that cannot afford their rent and are not being paid back by the Federal Government, for example. This shows a preference to exhaust funds so that our plaintiffs who are Black and Hispanic could not access these funds and so that they'd be exhausted. And even if she wasn't aware of this, the Treasury FAQs that accompanied the funding And so she should be held liable in damages and she has to pay. For her intentional and knowing discrimination. But OTDA is also subject to injunctive relief under Title VI for the remaining applications who sit here denied and have never received funding. There are tens of thousands of applications, as alleged in our amended complaint, who were denied rather than left pending and who still have not seen relief. And our PPH, as a membership organization, has both organizational and associational standing to bring Title VI on these people's behalf. None of these merits arguments, Your Honor, have been found at all below for the reason for this dismissal. Instead, the lower court found procedural barriers that are improper at this stage. These merits arguments should be had below properly at the 12B6 stage. I would be happy to answer any more questions, Your Honors, but I see my time has concluded. Thank you, Judge Bianco, and may it please the Court. Denny Lee for the Attorney General on behalf of Commissioner Barbara C. Quinn and the Office of Temporary and Disability Assistance. The New York legislature designed ERAP to ensure that federal COVID relief funds would make it into the hands of those with urgent financial need as soon as possible. That's why it prioritized processing applications from those residents of non-subsidized housing who did not already have the option of seeking downwards adjustments in their rent due to diminished household income. Plaintiffs' claims that administration of that policy constitutes a form of unlawful race-based discrimination under state and federal law fail for a litany of reasons, including lack of standing, mootness, sovereign immunity, qualified immunity, and failure to state a claim. And I welcome the Court's questions on any of those defects, but otherwise, I'll dive straight into this Title VI claim for intentional discrimination against OTDA, which is the only claim that survives the threshold defect. At the outset, contrary to plaintiffs' argument on reply, there's no need for a remand of this issue to the district court. It's well established that the sufficiency of a complaint is a pure question of law that this Court reviews de novo. The issue has been fully briefed, entails no findings of fact, and we think this issue is particularly easy to resolve at this stage because their claim for – their Title VI claim for intentional discrimination rests entirely on conclusory allegations of intentional discrimination on the part of OTDA. They repeatedly assert that implementation of the policy was a form of intentional discrimination. Their only argument on reply is that there was a foreseeable disparate impact, so obviously administration of the policy would constitute intentional discrimination. But it's well established that allegations – even allegations of a that those are adequately pled – don't give rise to an inference of intentional discrimination. In Feeney, for instance, the Supreme Court explained that discriminatory intent, quote, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker selected or reaffirmed a particular course of action, at least in part because of, not merely in spite of, its adverse effects on an identifiable proof, which means that absent anything – anything other than their allegations of disparate impact, the intentional discrimination claim was not adequately pled. And that is the one you're arguing because the others you claim fall – assuming standing – fall on sovereign immunity grounds. That's exactly right. Under the New York State Human Rights Law and the Fair Housing Act, New York State's OTDA enjoys sovereign immunity that hasn't been abrogated nor has it been waived. Let me ask you two questions. One is, do you concede that, at least as to plaintiffs Baez and Gil Frederick, that they had standing? I understand Johnson never applied for the program, but as to those two, do you concede they had standing? That's right. At this stage, we don't contest, to be clear, that plaintiffs have standing to seek monetary damages. We do contest their standing to seek injunctive and declaratory relief, both because they haven't pled a likelihood of future injuries and because the program closed in November 2025, which means that the claims for injunctive relief are moot because there isn't a policy to enjoin anymore. The ERAP priority policy just isn't in effect. And you also argue that, with respect to the Title VI claim against OTDA, that the disparate impact claim does not exist. It can only be disparate treatment, right? That's right. In Sandoval, the Supreme Court confirmed that there isn't a private right of action for disparate impact claims under Title VI. I was wondering if you could reply to your opponent's argument relating to qualified immunity defense as to Quinn, the defendant Quinn. And then my final question is on the negligence claim. Why should they be allowed to proceed on a negligence claim, perhaps in state court? So there were no negligence claims brought against the state defendant, so I'll leave that to NYSHA's counsel. As to qualified immunity, the basic problem there is that they failed to show that Commissioner Quinn violated clearly established law. Just last month, the Supreme Court in Zorn v. Linton confirmed that to overcome qualified immunity, a plaintiff has to identify a case where an officer took similar actions under similar circumstances and was found to have violated the Constitution or some statutory right. But if there were intentional, adequate allegations of intentional discrimination, wouldn't that be clearly established law? In other words, if somebody says, you know, I'm going to do this thing only for white people, not for black people, and this thing, whatever it is, is some new program that there's no precedent, you wouldn't say that it's not clearly established law, that you couldn't intentionally make that new program available only to white people. We absolutely agree. A complaint that had such blatant allegations of intentional discrimination would be clearly established under The argument has to be that their allegations of intentional discrimination are insufficient. And if all that's left is disparate impact, then there's really no claim at all, but at any rate, there would certainly be qualified immunity. That's exactly right. And I think the other problem with their qualified immunity argument is that they define the right far too broadly. From their perspective, the right is the right to be free from intentional race-based discrimination with no regard for the specific conduct alleged in question in this case. Right. But I mean, that really does hinge on the idea that the allegation that this was done intentionally on the basis of race is insufficient, because if it were sufficient, that this was done intentionally to disadvantage black and Latino residents, I don't understand how you would have a qualified immunity claim, even if the circumstances are somewhat novel. The novelty of the circumstances goes to the point that drawing an inference of racial discrimination on the basis of racial impact would be novel. That's exactly right. I don't take issue with anything you just said, Judge Lynch. I think, you know, the qualified immunity, of course, is tethered to the specific allegations about the— But it does still, if the allegations were sufficient, if there were some, you know, specific evidence suggesting intent to discriminate, if we thought that those allegations were sufficient, then I think that would undermine the qualified immunity, would it not? Right. That would be true. But I would just note that even assuming that their intentional discrimination claim makes it past the motion to dismiss H, they haven't identified a single case. And that is a strict requirement that the Supreme Court has at least articulated with respect to qualified immunity. They have to identify an analogous case that would have placed Commissioner Gwinn on notice that her conduct was violating clearly established law. All right. Thank you. Thank you. We urge the Court to affirm the judgment of the district court. Mr. Kramer. May it please the Court, Seth Kramer for Pele New York City Housing Authority. So in this case, there are two former NYCHA tenants and one current tenant, along with the resident organization that has an unrelated mission, that asserting claims that NYCHA should have adjusted the rent when it learned that two of the individual plaintiffs submitted ERAP applications, even though the ERAP application is a completely different process from the interim recertification process. These are not federal claims. These should have been brought at the relevant time as either state Article 78 proceedings or while they were tenants, and in the case of Ms. Gill-Frederick, she's still a NYCHA tenant, as an administrative rent grievance. As we've talked about, plaintiffs just adding the word discrimination, the formulaic recitation of elements is not enough to satisfy the pleading standard. There's no comparison to suggest any type of discriminatory intent. And as to disparate impact, in addition to the lack of comparison, there's a requirement to be challenging a policy of NYCHA. Here in the complaint, they cite the NYCHA policies for conducting recertifications, and they also, and don't take any issue with those. They also acknowledge that NYCHA made it easier to submit interim recertifications as a result of and during the COVID pandemic. Certain requirements, including a waiting period to make sure the income didn't go back up, those requirements were waived. Excuse me. Is the point here that none of the, you said originally one of the residents did not apply at all, and two did, but apply means apply for ERAP? Yes, apply for ERAP. None of them submitted interim. So you're saying none of them submitted applications for interim recertification? Correct, Your Honor. Plaintiffs could not explain why NYCHA would make it easier to submit recertifications, which they acknowledge happened, and they acknowledge that the number of interim recertifications that received went way up during the pandemic because NYCHA made it easier. So why would NYCHA make it easier to do these recertifications and then discriminate against the tenants by not conducting those, by not processing those recertifications? I mean, I guess your point is they made it easier to apply. These particular plaintiffs did not apply. We don't have to concern ourselves with any allegation that having made it easy to apply, they were therefore, whether because they were overwhelmed or they were negligent, they did not conduct those recertifications because there's no allegation relating to these plaintiffs about that. Correct, Your Honor. And that wouldn't be discrimination anyway, but yes, that's correct. And I want to address the statute of limitations argument, and then I'll address the question about the negligence claims briefly. The FHA claim is the only claim here that would possibly allow disparate impact, and the court properly found that it's time-borrowed. All the allegations against NYCHA are based on facts that purportedly occurred in 2020 or 2021. This case was commenced more than two years later in 2024, and the continuing violation theory is inapplicable here. The district court properly cited the case law that holds that the continuing violation doctrine is not applicable where a plaintiff could assert a claim and sit on their rights. Here, they knew in 2021 or 2020 that NYCHA did not adjust the rent, and that would have been the appropriate time. In their brief, plaintiffs make a claim that they were not on notice that there was discrimination until years later, which is a completely circular claim. There's no evidence they point to, nothing that occurred between 2021 and 2024 that would have given them notice of a discrimination claim, and it's circular because there was no discrimination. So it would just open the door indefinitely for someone to assert a claim until some date where they say, okay, now we believe it's discrimination. And the commencement of the rent collection proceedings, as the lower court held, is insufficient, does not trigger statute of limitations. That's just when a certain harm, separate and apart from the alleged harm of not getting reduced rent, which would have occurred in 2021, the rent collection proceedings years later is not what triggers the statute of limitations and new. As to the negligence claim which was made against NYCHA, I don't recall whether that's discussed in the appellate briefs by plaintiffs, but there were three bars to the negligence claim that's a state law claim. One is that the state law would require a notice of claim be submitted beforehand as a procedural prerequisite. The other two, I think, are probably more relevant. One is, again, there's a statute of limitations and general municipal law of one year and 90 days for a tort, for a negligence claim, rather, or any tort claim against NYCHA. This would exceed the year and 90 days. And the third is, again, in state law, if you're going to be claiming that an agency didn't properly conduct an interim recertification, did not take action, challenging the calculation of rent, the way to do that would be to commence an Article 78 proceeding. That's the sole method, and it wouldn't be a negligence claim in this federal case or even a negligence claim in state court. All right. Thank you. Thank you. Okay, Mr. Selsman, you have about two minutes. Thank you, Your Honors. I would like to clarify one point for each defendant on rebuttal. First, as to the scheme related to NYCHA, as well laid out in the amended complaint, the first missed interim recertification is not what constituted discrimination for these This was a pattern or practice of missed annual recertifications that then led to them bringing rental arrears cases against our plaintiffs in order to take improper rents from them. As laid out in the amended complaint, NYCHA is currently in a scheme where they are leasing out their residents to the RAD PACS program, which we believe, as alleged in the amended complaint, as well alleged in the amended complaint, are more likely to be filled with residents that are not black and Hispanic like our plaintiffs. All of this was part of that scheme, and those are the merits that should go back down to the lower court for analysis as to whether that constitutes intentional discrimination. I'm sorry. I'm not sure I have ever understood that to be part of the What are you talking about? What is the claim about renting out the residents to some other program? What is this? Certainly, Your Honor. Residents to preserve public housing, for example, the organizational plaintiff here, is one of its big missions is around organizing around the RAD PACS program, which as laid out in the amended complaint, is where NYCHA is leasing units to private, leasing buildings to private owners to manage and at the expense of preserving Section 9 housing. That is part of the merits laid out in the amended complaint and briefed below, but this is not just Was that briefed to us? I mean, I'm just not, maybe I'm totally blue and I'm trying to understand this program, which sounds like I thought this case was about the EREP and CREP and the recertifications, and now you're telling me it's about something else, which is fine. I just didn't understand that to be the argument. Yes, Your Honor, and I'm sorry if it was not clear from the briefing. We really focused on the standing issues as laid out in the briefing, rather than the merits of the claims, which we're going back and forth on now. We are here plaintiff I wasn't going back and forth on that claim because I didn't know that claim existed. So that, you know, just trying to understand. So that was something that's in the complaint. Yes, Your Honor. And that the organizational defendant has standing to raise. And we also, as well as our individual plaintiffs who are currently in NYCHA housing and being subject to this discriminatory scheme in state court. Well, if you call it a discriminatory scheme, that gets me to the other problem. But putting that aside, what is happening there exactly that is discriminatory and bad that they have standing to raise? Certainly. So the pattern of practice here, so as an example, an individual plaintiff here, Sadie Gilfredrick and Ms. Wanda Baez, live in NYCHA housing. Rental arrears, they fail to not just at the first interim date, but also as a pattern at each annual date, which plaintiffs themselves are not required to initiate. That's on NYCHA to initiate. These are missed. They bring these cases against them. In addition to people just watch their rent accrue at a rate that they cannot afford. They're pushed out of their housing. So there is a failure to comply with the requirements, the Federal requirements of annual recertification. Yes, Your Honor. And this constitutes a pattern or practice that necessarily could not accrue for plaintiffs until many times it had occurred for them to understand that this was discrimination. That was happening. Well, I still don't understand the discrimination argument, but that's separate. Because I assume that absent, am I wrong, that you don't need a discrimination claim to be able to say that a pattern of refusing to or failing to do timely annual certifications, that would be a violation of Federal law, right? Certainly, but we bring up... Wait, wait, wait, wait, wait. I think I'm helping you. I hope I'm helping you here. Because I don't, I'm not buying your discrimination thing, you see. So I'm trying to see if there's a claim there that is different. And so it would be a violation of Federal law for them to persistently refuse or fail to do annual recertifications. Is that true or am I wrong? That's a violation of their duties under the Section 9 program, yes. Yes. And that happened to these folks, and they have a private right of action to enforce, to sue for that violation. Yes, Your Honor, and we bring those claims up. So the only point that was made on the other side about that, today at least, is timeliness. Yes, Your Honor, and that's where we would say that this is an exact... You didn't bring that as a separate claim. All your claims, I think you just said earlier, you're only raising that violation in the context of discrimination, right? Yes, Your Honor, and that's... But what you're doing is saying you don't need to prove discrimination to try to enforce that right. You were about to say we do that all the time. How do you normally do that? If this happens outside of the discrimination context, how do you sue for that? Well, so, I mean, we are currently representing our individual plaintiffs in the consumer debt claims, trying to properly get their incomes recertified in these state claims. But that's why we bring a class action. It shows a broader pattern and practice of discrimination in that... Okay. So it does depend on discrimination, because otherwise there would be a statute of limitations problem, right? Because they were aware, in a timely way, that they didn't get their annual recertification. Well, in that sense, Your Honor, it would constitute discrete acts every time they missed a recertification? Well, it would be, yes. Yes, Your Honor. So, right. So at least the past two years of missed annual recertifications would fall into the... I don't understand. Why can't you bring a class action without discrimination just for a violation of federal law? Why do you have to have discrimination if they're just flagrantly violating federal law provisions? I'm not sure the answer to that, Your Honor. But this was... You could also bring Article 78s to do that as well, right? Yes, Your Honor. But this is part of a broader scheme of discrimination, as alleged in the amended complaint. If I... But why is it a scheme... I guess, never mind. I think we've been through the arguments about why you think it's an intentional discrimination. But it does sound like you are saying, as I kept trying to ask, that the simple fact that NYCHA violates federal requirements with respect to its residents is ipso facto racially discriminatory, intentionally racially discriminatory, because their residents are primarily Black and other minorities. Again, I would point, Your Honor, to the amended complaint, which speaks to a scheme to replace these tenants with... They want to replace these tenants with white poor people? The RADPAC tenants are much more likely, in New York City, the population right now that we have filling these units. It's much less likely to be the Black and Hispanic people that make up our plaintiffs. And this is happening around the city, and it's what our PPH has been designed to organize against. Is there... I mean, there are factual allegations that the white population of public housing is rising due to these activities? Yes. Yes, Your Honor. The amended complaint lays out the discriminatory pattern of practice as alleged as part of the RADPAC program and missed annual recertifications. And I'm just... Where is that described in your brief? In a way that... I mean, I think this... Where this is coming up, I think, is the institutional standing of your institutional client, right? That's what we're talking about mostly here? This scheme, I believe, would give standing to our individual plaintiffs as well who are currently in court. But where in the brief is that argument? Here's an important thing that we have standing to raise that has otherwise been ignored. So this is paragraphs 23 as well, 179 to 180 in the amended complaint? I'm not going to mess with the amended complaint. I'm asking you in your brief, to us, what did I miss? Because I obviously missed this. I'm sorry, Your Honor. I think that the confusion here is that this isn't a... We didn't brief the merits of the racial discrimination claim at... Since this was dismissed as a standing question. The lower court here found that there was only speculative relief that NYCHA could award because... But you see, as I understand the speculative relief, I thought that had to do with the case that I understood to be about ERAP and CEREP. And I understood their argument to be that ERAP and CEREP are over and the possibility that there will be another pandemic may be something a reasonable person might anticipate. The possibility that the federal government will ride to the rescue again with something like the ERAP program strikes me as highly speculative. But you have a point. And I thought then that you argued, though, that that isn't so speculative and yada yada. And that was all about ERAP and CEREP. So I'm not... I'm asking you where in the brief was it argued that the reason that these folks have standing for injunctive relief has to do with this scheme about this rental, renting out of public housing to private managers. Where does that show up? Your Honor, our briefing as to NYCHA was fully based on our standing to bring claims as to the Section 9 program against NYCHA, which is all we've been talking about. However, what we've been talking about is the merits of those claims. And all we've referred to in our briefing was that they have current harms and injuries that are being seen in these state courts that give them at least traceable standing. But yeah, but these claims that you're saying they clearly have standing to raise are not about ERAP and CEREP, right? They're something else. No, it's about the implementation of the Section 9 program, which NYCHA is separately funded by the federal government by and separately liable for Title VI liability because of that. And that's what we tried to distinguish in our briefing. The lower court here confused the issues as only representing one federally funded program. I think I remain confused, and that's why I keep asking you to point to me to where in your brief you say these things. I'm sorry, Your Honor, I don't have the paging of the briefing in front of me, but the standing section on NYCHA speaks only to our standing to bring claims related to the implementation of the Section 9 program, not the emergency rental assistance program. And it's their implementation of the Section 9 program that leads to the discrimination and harm against our plaintiffs and that the court certainly has standing to remedy at least Title VI, as well as we believe the Fair Housing Act. I guess I'll find it. Thank you.  Okay. Thank you, Your Honor. To everyone, we'll restart the decision. Have a good day.